Filed 2/25/15  In re Denise C. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re DENISE C., et al., Persons Coming Under the Juvenile Court Law. | B256312 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent.<br><br>        v.<br><br>T. R.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK85618) |

        APPEAL from orders of the Superior Court of Los Angeles County.  Rudolph A. Diaz, Judge.  Affirmed.


        Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.


        Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel for Plaintiff and Respondent.

Appellant T. R. (mother) appeals from the juvenile court's orders establishing dependency jurisdiction over her four children, Denise C. (born April 2005), N. C. (born May 2008), Nelson C. (born November 2010), and A. C. (born July 2012) and removing the children from the custody of their father, Nelson C., Sr. (father).[1]  Mother contends there was insufficient evidence to support the juvenile court's jurisdictional findings under Welfare and Institutions Code section 300, subdivisions (a), (b), and (j),[2] that the children were at risk of harm because of domestic violence between the parents and the dispositional order removing the children from father's custody.  We affirm the jurisdictional and dispositional orders.

## BACKGROUND

### Initial detention and section 300 petition

The family came to the attention of the Los Angeles County Department of Children and Family Services (the Department) in November 2010 when mother and newborn Nelson both tested positive for methamphetamine.  Mother admitted using methamphetamine in the past but denied doing so immediately before Nelson's birth.

On December 3, 2010, the Department filed a section 300 petition alleging that mother's substance abuse placed Denise, N., and Nelson at risk.  At the December 3, 2010 detention hearing, the juvenile court found father to be the children's presumed father and ordered the children detained from both parents.

In a January 2011 interview with a dependency investigator, five-year-old Denise said that mother and father used drugs and alcohol together.  She reported that mother and father hit her and N. with a belt and that the parents argued and hit each other as well.

Both parents denied hitting Denise or any of the other children.  They admitted arguing but denied doing so in the children's presence.  They denied having any physical altercations.

---

[1]     Father is not a party to this appeal.

[2]     All further statutory references are to the Welfare and Institutions Code.

2

Mother denied having a drug problem. She admitted using marijuana and cocaine in the past. She also admitted using methamphetamine in June but denied doing so since then. Father was on parole for a 2008 firearms conviction. He said he and mother had an understanding that neither of them would do anything to jeopardize his parole. Had he known of mother's drug use, he would have asked her to stop.

On January 28, 2011, the Department filed a first amended petition adding allegations that the parents physically abused the children, engaged in domestic violence, and exposed Denise to altercations in which they physically assaulted one another. The parents agreed to submit to an amended petition under section 300, subdivisions (b) and (j) stating that mother had a history of substance abuse, including cocaine, marijuana, and alcohol, and had used methamphetamine while pregnant with Nelson, who had a positive toxicology screen for methamphetamine at the time of his birth; that father knew or should have known of mother's use of controlled substances; and that mother's substance abuse and father's failure to protect placed the children at risk of harm. The amended petition further stated that mother and father had created a detrimental home condition by their aggressive conduct, by engaging in altercations in the presence of the children, and by using inappropriate physical discipline on Denise.

The juvenile court sustained the petition as amended and ordered the children removed from both parents. The court accorded family reunification services to both parents and ordered mother to enroll in a drug rehabilitation program with random testing, aftercare with a sponsor, individual counseling, and parent education. Father was ordered to enroll in individual counseling to address case issues including substance abuse awareness. The court ordered individual counseling for the children as well.

**Section 388 petition**

On April 28, 2011, the Department filed a section 388 petition seeking a random drug testing order for father on the grounds that father had admitted to a history of drug use. The petition stated that father had been on parole after serving a 32-month prison sentence for carrying a loaded firearm in public and had been drug testing as a condition

of his parole, but his parole was ending and he would no longer be required to drug test for the criminal courts.

On June 23, 2011, the juvenile court granted a modified section 388 petition and ordered father to participate in on demand drug testing.

**Review proceedings**

In August 2011, the children were placed together in a foster home. The children's caregiver reported that during monitored telephone calls with Denise, father made the child cry by yelling at her, accusing her of taking things, and telling her there were cameras in the caregiver's home and that he was watching her. The caregiver further reported that Denise had told her that when the parents fight, mother throws knives at and sometimes cuts father. According to Denise, father threw something at mother during one altercation but hit Denise in the eye instead. Denise was bleeding, and the parents had to take her to the hospital.

Mother participated in weekly random drug testing. Between February and July 2011, she had seven negative drug tests, two missed tests, and two positive tests for methamphetamine. Father submitted to an on demand test on July 21, 2011, and tested positive for amphetamines and methamphetamine.

Mother was enrolled in parenting education, substance abuse awareness, and NA/AA classes and was on a six-month waiting list for individual counseling. Father had enrolled in parenting education and was also on a waiting list for individual counseling. Neither parent had provided proof of enrollment in a drug rehabilitation program.

At the six-month review hearing held on August 3, 2011, the juvenile court found the parents to be in partial compliance with their case plans, ordered their visits to be monitored in the Department's offices, and ordered the parents not to visit the children together.

In December 2011, the Department reported that both parents had become increasingly argumentative with the monitors when redirected during visits with the children. The children's caregiver informed the Department that she no longer wanted to monitor the visits because the parents were too aggressive, arguing with her and yelling

4

at her in front of the children. Mother asked that the children be placed with a maternal aunt.

The caregiver reported that Denise often appeared "traumatized" or "devastated" after visits with the parents. After one visit, Denise told the caregiver that she did not want to return home to mother and father and accused the parents of touching her "pee pee." During an interview with the social worker who responded to the child's allegations of sexual abuse, however, Denise did not describe sexual abuse but indicated that the parents may have substituted Denise's urine for their own when required to drug test. Denise would not speak to the parents by telephone and refused to participate in a monitored visit with mother on December 8, 2011.

Mother tested positive for methamphetamine and amphetamines twice, in October and November 2011, and missed two tests. Father also tested positive for methamphetamine and amphetamines twice and missed two tests.

At the December 2011 progress hearing, the juvenile court ordered that the parents not be allowed to visit when under the influence. The court further ordered the Department to hold a team decision meeting to consider placing the children with an appropriate relative. Following the court ordered team decision meeting, the children were placed with a maternal aunt in early January 2012.

In March 2012, the Department reported that mother had tested positive for amphetamines and methamphetamine on February 9, 2012. Father submitted to two on demand drug tests in February and March 2012 and tested negative both times. The social worker's attempts to reach father for subsequent test dates were unsuccessful. The social worker had also made several attempts to contact mother by telephone to discuss the case, but mother had neither taken nor returned the calls.

In July 2012, the Department reported that mother had completed 10 sessions of individual therapy. She was also enrolled in a drug treatment and aftercare program. Mother tested positive for methamphetamine on February 22, 2012, and had seven negative tests and three missed tests thereafter. Father had three negative drug tests

between February and April 2012. He did not drug test in May because the social worker was on leave.

In July 2012, mother informed the social worker that she was eight months pregnant. She gave birth to A. on July 23, 2012. The Department opened a voluntary family maintenance case for A., who lived with mother, father, and mother's 18-year-old son.

Mother had completed her drug treatment program and was attending after care services and 12-step meetings. Between July 2012 and January 2013, mother had 10 negative drug tests and eight missed tests.

In July 2012, the juvenile court ordered unmonitored visits for father after he had submitted five consecutive clean drug tests. In December 2012, the Department liberalized mother's and father's visits to unmonitored joint visits at the parents' home. The visits went well, and Denise and N. both said they wished to return to their parents.

In February 2013, the Department received a referral that N. had belt marks on her legs after being hit by the maternal aunt's live-in boyfriend. The Department detained the children from the aunt and recommended that the children be released to their parents, who had completed their programs and were having successful unmonitored visits.

At the 18-month review hearing held on February 13, 2013, the juvenile court ordered the children returned to mother and father with family maintenance services.

**Family maintenance period**

In August 2013, the Department reported that mother and father had maintained consistent contact with the Department and were appropriate and attentive to the children's needs. Father had completed his individual therapy sessions but felt the need to reenroll in counseling. He was assessed and approved for additional individual therapy sessions.

Therapy sessions for Denise and N. had been terminated because the therapist was unable to contact the parents to arrange weekly sessions. The family was receiving family preservation services.

Mother and father had not complied with random drug testing. Mother had four negative drug tests and nine missed tests. Father had five negative drug tests and seven missed tests.

In November 2013, father's therapist reported that he had been participating in therapy and doing well until August. Father attended only one session in the months of September and October and had not attended any sessions in November. His therapy sessions were terminated for lack of attendance.

Both parents continued to be inconsistent in their drug testing. Between August and October 2013, Mother had three negative drug tests and two missed tests. Father had two negative drug tests and five missed tests during the same period.

The Family Preservation Services counselor terminated the family's case in November 2013 because he said the family appeared to be doing well and was no longer in need of services.

Between November 2013 and January 2014, mother tested negative for drugs once and missed seven tests. Father missed all of his drug tests between October 2013 and February 2014.

**Father's 2013 arrest**

Father was arrested following an incident of domestic violence on December 19, 2013. Mother told the social worker that while she and father were arguing, father put his arm around her neck but did not choke her. She said the children did not witness the incident.

The police report stated that mother and father had argued in the kitchen about a broken wrist watch. As mother attempted to walk away, father grabbed her around the neck with his right arm and began choking her. Mother broke free and told father she was leaving to pick up the children from school. Father became more angry, grabbed a knife, held it down by his side, and said, "if you take my children we are gonna have a blood battle and everyone is gonna go down." Mother, fearing for her life, left the home and called the police.

Mother told the police that father's past gang affiliation and criminal history made her believe father had the means and the ability to follow through on his threats. Although she had no visible injuries, mother was crying and fearful.

When responding police officers approached the home, father said, "I'm the guy you are looking for." The officers observed several small scabbed cuts on father's arm that appeared to be evenly spaced and approximately the same length. The officers saw multiple knives in the kitchen, including one lying on the floor near the refrigerator.

Father was arrested and charged with making criminal threats. While being transported to the police station, father told the police officers that had he known mother was going to call the police, he would have "really messed her up."

At the police station, father provided a written statement that he and mother had argued about a broken watch. According to father, the argument escalated and mother grabbed a 12-inch serrated kitchen knife and assaulted him, causing approximately 16 minor lacerations to his left forearm while he attempted to defend himself. Father claimed that in addition to cutting him with a knife, mother punched him three times.

The police concluded that father was the primary aggressor during the incident. An officer indicated that the lacerations on father's arm were not recent wounds and did not appear to have been caused by a 12-inch serrated knife.

Father was incarcerated from December 19, 2013 to January 12, 2014. After his release, father moved out of the family home and did not have a permanent address.

At a February 11, 2014 review hearing, the juvenile court ordered that father could have monitored visits with the children outside of the family home.

**Section 342 and section 300 petitions (2014)**

On February 26, 2014, the Department filed a section 342 petition on behalf of Denise, N. and Nelson, and a section 300 petition on behalf of A., alleging, under section 300, subdivisions (a), (b), and (j), that the parents have a history of engaging in violent physical altercations; that on December 19, 2013, father grabbed mother's neck with his arm and choked mother in the child Nelson's presence; father threatened mother with a knife; mother hit father and struck him with a knife, inflicting marks on father's arms;

8

and that the parents' violent conduct endangers the children's physical health and safety and places them at risk of harm. At the February 26, 2014 detention hearing, the juvenile court ordered the children detained from father and released to mother. Father was accorded monitored visits.

In a March 11, 2014 interview with the Department's social worker, mother described the December 19 incident with father as an argument that ended when father put her in a choke hold. She said none of the children witnessed the incident because the older children were in school at the time and the two younger children were asleep in another room. Mother said the altercation took place in her older son Tommie's bedroom and that Tommie was not home at the time. She denied that father threatened her with a knife.

Father was present at the home during the March 11, 2014 interview with mother. Both parents insisted father was allowed monitored visits with the children in the home and that mother could serve as the monitor. Father told the social worker that during the December 2013 altercation he did not choke mother but simply put his arms around her neck and then released her. He admitted grabbing a knife and saying there would be a blood bath if mother took the children. Father said he pled guilty to a domestic violence charge in the criminal court and that a protective order was issued prohibiting him from using force or violence toward anyone involved in the case. He was enrolled in a domestic violence program required by the criminal court.

**Adjudication and disposition**

At the May 14, 2014 adjudication hearing, the juvenile court received into evidence the Department's February 2014 detention report and the March 2014 jurisdiction/disposition report. Mother and father both testified.

Mother testified that on December 19, 2013, she and father argued in the kitchen about a broken watch. They moved into the living room where father pushed her. When mother "stopped and went to him with my hand," father grabbed her around the neck with his arm, and mother fell to her knees. Mother said that father had his arm round her

9

neck for approximately four seconds, that she was still able to breathe, and that he released her when she said "let me go."

Mother testified that after father released her, she went outside to find a neighbor. No one was about, so mother returned to the home approximately five minutes later. When she returned, father was in the kitchen cutting lettuce with a knife. Mother denied that father threatened her with the knife and denied telling the police that she feared for her life or was worried about father's past gang affiliation. She said that during the incident A. and Nelson were both in a bedroom adjacent to the living room. A. was sleeping and Nelson was awake watching television. Mother could not recall whether the bedroom door was open or closed.

During his testimony, father admitted putting his right forearm around mother's neck and that he "squeezed it a little bit." He said his attempt to choke mother "was just an impulse." Father acknowledged that he had made a mistake and said he regretted his actions. Father also admitted that his written statement to the police that mother had punched him and attacked him with a knife during their altercation was false.

After hearing argument from the parties, the juvenile court found the testimony of both parents lacked credibility. The court found the allegations of domestic violence under sections 300, subdivisions (a), (b), and (j) to be true, struck allegations regarding father's arrest, and sustained the petitions as amended. The court ordered the children removed from father's custody and ordered father to participate in a 52-week domestic violence prevention program, a parenting program, and individual counseling with a licensed therapist to address domestic violence and anger management. Father was accorded monitored visits to take place outside of the home. Mother could not serve as the monitor. This appeal followed.

## DISCUSSION

### I. Standard of review

We review the juvenile's court's jurisdictional findings under the substantial evidence standard. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) Under this standard, we review the record to determine whether there is any reasonable, credible,

10

and solid evidence to support the juvenile court's conclusions, and we resolve all conflicts in the evidence and make all reasonable inferences from the evidence in support of the court's orders. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.) We review the juvenile court's selection of a dispositional order for a minor for abuse of discretion. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.)

## II. Jurisdiction

### A. Section 300, subdivisions (a), (b), and (j)

Section 300, subdivision (a) accords the juvenile court jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent."

Section 300, subdivision (b) accords the juvenile court jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child."

Section 300, subdivision (j) accords the juvenile court jurisdiction over a child when "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

### B. Substantial evidence supports the jurisdictional findings

Substantial evidence supports the juvenile court's findings that the parents' domestic violence placed the children at risk of future harm. During the December 19, 2013 domestic violence incident, mother and father were engaged in a heated argument that became physically violent. Father pushed mother, put his forearm around her neck, and choked her. When father released her, mother told him she was leaving to get the children. Father then grabbed a knife, held it by his side, and said: "If you take my children, we are gonna have a blood battle and everyone is gonna go down." Throughout the parents' altercation, A. and Nelson were in an adjacent bedroom. Nelson was awake, and the bedroom door may have been open.

11

After father released her, mother left the home to call the police, in fear for her life. She was crying and fearful when the police arrived. Father told the responding police officers "I'm the guy you are looking for." While father was being transported to the police station, he told the officers that had he known mother was going to call the police, he would have "really messed her up."

Mother argues that her testimony at the adjudication hearing disputed information in the police report that father threatened her with a knife, and that she was in fear for her life. She denied any history of domestic violence with father. The juvenile court found neither parent's testimony to be credible. Under the applicable standard of review, we must defer to the juvenile court on issues concerning credibility of the witnesses and resolve all conflicts in the evidence in favor of the juvenile court's findings. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.)

Mother contends the December 19 altercation was an isolated incident that should not be used as a basis for ongoing juvenile court jurisdiction. She cites *In re Daisy H.* (2011) 192 Cal.App.4th 713 (*Daisy H.*) as support for her position. That case, however, is distinguishable.

In *Daisy H.*, juvenile court jurisdiction was based on a single incident of domestic violence by the father against the mother that occurred more than two years before the section 300 petition was filed and before the parents had separated and commenced marital dissolution proceedings. All of the children denied witnessing any domestic violence between the parents, and there was no evidence that any incidents of violence occurred in the children's presence. (*Daisy H., supra*, 192 Cal.App.4th at p. 717.) The appellate court concluded the evidence was insufficient to support jurisdiction premised on ongoing domestic violence or violence likely to continue, placing the child at risk of physical harm. (*Ibid.*)

Here, in contrast, there was evidence of both ongoing and past domestic violence between the parents in the presence of the children. The December 19, 2013 domestic violence incident occurred only a few months before the adjudication hearing. Throughout that incident, A. and Nelson were in an adjacent bedroom. Nelson was

12

awake. At the time the initial section 300 petition in this case was filed, then five-year-old Denise told the social worker that mother and father hit her and N. with a belt, and that the parents argue, fight, and hit each other. After she was removed from her parents' care, Denise told her caregiver that the parents fight and that mother throws knives at father and sometimes cuts him. Denise told the caregiver that during one altercation, father threw something at mother but the object hit Denise in the eye instead. Denise was bleeding, and the parents had to take her to the hospital.

Mother and father both sought to minimize the severity of the December 2013 altercation. They denied statements they each made to the police that day that a knife was used during the altercation.

Substantial evidence supports the juvenile court's jurisdictional findings under section 300, subdivisions (a), (b), and (j) that the parents' domestic violence placed the children at risk of future harm.

## III. Dispositional order

### A. *Standing*

The Department contends mother lacks standing to challenge the order removing the children from father's custody because mother retained custody of the children and her interests were not affected by the order.

A parent who is aggrieved by an order after judgment in a juvenile dependency proceeding may appeal from that order. (§ 395.) For purposes of appellate standing in dependency cases, a parent who suffers a legally cognizable injury, actual or threatened, by the juvenile court order is an aggrieved party. (*In re H.G.* (2006) 146 Cal.App.4th 1, 9.) Although appellate courts "liberally construe the issue of standing and resolve doubts in favor of the right to appeal" (*ibid.*), "'[a]n appellant cannot urge errors which affect only another party who does not appeal.' [Citations.]" (*In re Gary P.* (1995) 40 Cal.App.4th 875, 977, citing *In re Vanessa Z.* (1994) 23 Cal.App.4th 258, 261.) In other words, "a parent is precluded from raising issues on appeal which did not affect his or her own rights. [Citations.]" (*In re Jasmine J.* (1996) 46 Cal.App.4th 1802, 1806; *In re Nachelle S.* (1996) 41 Cal.App.4th 1557, 1562 [mother whose parental rights were

13

terminated lacked standing to challenge order affecting minor's visitation with siblings and could not assert minor's best interests as basis for standing].)

Mother cites *In re R.V.* (2012) 208 Cal.App.4th 837 (*R.V.*) as support for her argument that she has standing to challenge the dispositional order removing the children from father's custody. In that case, the juvenile court assumed jurisdiction over a child based on risk of sexual abuse by the father and ordered the child removed from both parents' custody. The father challenged the dispositional order removing the child from the mother's custody, and the county argued that he lacked standing to do so. (*Id.* at p. 848.) Noting that "'[u]ntil parental rights are terminated, a parent retains a fundamental interest in his or her child's companionship, custody, management and care,'" the court in *R.V.* held that the father had standing to challenge the order removing custody from the mother and placing the child in foster care. (*Id.* at p. 849.) The court reasoned that the child's placement outside of the home had the potential to adversely affect the father's own interests in reunification. (*Ibid.*)

In the instant case, mother's interest in reunification is not at issue because she has custody of the children. *R.V.* is therefore distinguishable.

Mother argues that the dispositional order affects her interests because it jeopardizes the children's relationship with father and could result in "[t]he possible loss of 50% of parental support to the[] children." She cites no authority, however, that potential harm to the children's relationship with father and the potential loss of father's parental support is a legally cognizable injury to *her* that would accord her standing as a party aggrieved by the juvenile court's dispositional order.

We need not resolve the issue of whether mother is an aggrieved party with regard to the dispositional order removing the children from father's custody because even assuming mother has standing to challenge that order, we find no grounds for reversal.

### B. Substantial evidence supports the dispositional order

Section 361, subdivision (c)(1) provides that the juvenile court may remove a child from the physical custody of his or her parent when the court finds, by clear and convincing evidence, that there is a substantial danger to the physical health, safety,

protection or emotional well being of the child and there are no reasonable means to protect the child without removal from the parent's physical custody. The determination of whether there is a substantial danger to the physical or emotional health and safety of a child who remains in a parent's physical custody is reviewed under the substantial evidence standard. (*In re Amos L.* (1981) 124 Cal.App.3d 1031, 1038.)

Substantial evidence supports the order removing the children from father's custody, requiring both parents to participate in domestic violence counseling, and requiring father's visits to be monitored by someone other than mother. The parents had an unresolved history of domestic violence dating back to 2011. In December 2013, the parents engaged in a physical altercation while A. and Nelson were in an adjacent room in the home. During the altercation, father choked mother and threatened her while holding a knife. Fearing for her life, mother called the police.

Both parents attempted to minimize the severity of the December 2013 incident by recanting statements they had each made to the police. Mother subsequently allowed father to visit the children in the family home, in violation of court orders.

Substantial evidence supports the juvenile court's dispositional findings, and the order removing the children from father's custody was not an abuse of discretion. (*In re Christopher H., supra*, 50 Cal.App.4th at p. 1006.)

## DISPOSITION

The orders establishing juvenile court jurisdiction over Denise, N., Nelson, and A. and removing all four children from father's custody are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:

_____, Acting P. J.    _____, J.
ASHMANN-GERST                                         HOFFSTADT

15